```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
```
ELECTRONICALLY FILED
DOC #:
DATE FILED:
```

------------------------------------------------------------x
                                                            :
**Kingvision Pay-Per-View, Ltd.,**                          :
                                                            :     05 Civ. 5226 (HB)
            **Plaintiff,**         :
                                                            :     <u>OPINION & ORDER</u>
        -against-                             :
                                                            :
**Felix Jiminez and El Valle Restaurant, a/k/a**            :
**J&J Sports Bar, Inc.,**                                   :
                                                            :
            **Defendants.**        :
------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**[*]

    Plaintiff Kingvision Pay-Per-View Ltd. ("Kingvision") brought this action against defendants El Valle Restaurant, also known as J&J Sports Bar, Inc. ("J&J"), and Felix Jiminez ("Jiminez"), J&J's owner, alleging that defendants illegally broadcast the November 13, 2004 pay-per-view boxing match headlined by John Ruiz and Andrew Golota, in violation of 47 U.S.C. §§ 553 & 605. A bench trial was conducted before this Court on May 15, 2006. For the reasons that follow, judgment is entered for the defendants.

## FINDINGS OF FACT

    At trial, plaintiff called Alan Gelb, an attorney employed by Kingvision, and Jose Batista, an investigator hired to detect unauthorized reception of the Ruiz/Golota event.[1] According to Gelb, Kingvision's "piracy counsel," pay-per-view events may be broadcast in several ways. (Transcript of Bench Trial, dated May 15, 2006 ("Tr.") at 8, 24). Kingvision may transmit its signal to subscribers through a consumer satellite television provider, such as DirectTV or the Dish Network, or through a cable television company. (Tr. at 24). However, a commercial establishment must contact Kingvision directly to purchase a pay-per-view event. (Tr. at 8–9, 24). In such instances, the broadcast is transmitted through a satellite provider or cable television company. (Tr. at 11–12).

---

[*] Elizabeth Lash, a second year law student at The Ohio State University Moritz College of Law and a summer 2006 intern in my Chambers, provided substantial assistance in the research and drafting of this Opinion.

[1] The record is unclear regarding the spelling of Mr. Batista's name. Batista gave the spelling of his name as "B-a-s-t-i-s-t-a." (Tr. at 39). However, throughout the proceedings the parties referred to him as Mr. "Batista." For the sake of clarity, I will refer to him as Jose "Batista" as well.

1

Gelb also testified regarding some of the methods that commercial establishments can employ to "steal" pay-per-view events. (Tr. at 7–9). For example, a commercial establishment may install satellite television service and fraudulently register its account as residential. (Id.). Here, however, J&J was in fact registered as a commercial user with DirectTV. (Tr. at 8–9, 24). Gelb also testified that customers may illegally display an event by temporarily transferring a residential cable or satellite receiver to a commercial establishment. (Tr. at 9). Gelb explained that commercial establishments often bought unauthorized receivers over the internet. (Tr. at 10). Gelb did not, however, testify as to the specific manner in which J&J (allegedly) displayed the Ruiz/Golota pay-per-view event on November 13, 2004. (Tr. at 24–27).

According to Gelb, the price Kingvision charges to commercial customers is determined by multiplying the event price by the maximum number of legal occupants for the venue. (Tr. at 36–37). Obviously, when an event is shown illegally, Kingvision is unable to collect this fee. (See Tr. at 36–39). In addition, Kingvision suffers a reduced rate of return on the money it has spent to promote the event through commercials, print ads, and direct mail pieces. (Tr. at 19–20, 36).

Kingvision contracts with outside entities to investigate the unauthorized interception of its signals. (Tr. at 16). In this instance, Kingvision contracted with Signal Auditing. (Id.). Signal Auditing retains auditors, who are given lists of authorized Kingvision customers and instructed to look for commercial establishments displaying an event illegally. (Tr. at 12, 16–17). Gelb testified that Kingvision does not train these auditors, but rather expects the contractors to do so. (Tr. at 22–23). Batista, the auditor who claimed to have discovered J&J's piracy, testified that he had received no training "per se" from Signal Auditing. (Tr. at 51). Gelb testified that auditors are generally given a form affidavit to complete, which includes the names and descriptions of an establishment's employees, the number of individuals viewing the event at the location and, if possible, license plate numbers of those parked nearby. (Tr. at 20–21). After receiving an auditor's report, Gelb generally compares the time of the observation, the fight observed, and the auditor's video tape (if one is submitted) against a tape of the actual event. (Tr. at 15–16).

Batista submitted a completed affidavit, dated November 20, 2004, created from notes that he took on November 13th and 14th after visiting J&J. (Tr. at 14–15, 41, 52; Ex. A). The affidavit states that Batista visited J&J at approximately 11:00 p.m. on November 13, 2004,

2

where he witnessed a portion of the match between Jamel McCline and Chris Byrd, an undercard fight before the Ruiz/Golota event. (Tr. at 2–3, Ex. A). J&J was not authorized by Kingvision to show the fight. (Tr. at 20).

On the affidavit, Batista noted seeing only one television set and described it as a "very large floor model," which he drew on a diagram at the bottom of the affidavit. (Ex. A). Batista testified that he noted only one television in total because he was "focusing on the one television [he] saw" showing the fight. (Tr. at 58–60). Batista's affidavit states that J&J did not charge an admission fee. (Ex. A). The affidavit does not include a description of any of the employees working at J&J that night, or a description of J&J's façade. (Id.). However, Batista did submit a photograph of the exterior of J&J that he took the next day, November 14, 2004. (Exs. A, B). Batista failed to record any license plate numbers of those parked nearby; in fact he explained that he had not seen any parking lot for the establishment. (Tr. at 46; Ex. A). However, Jiminez testified that J&J does have a customer parking lot on 134th street. (Tr. at 67).

Batista noted that he observed no cable box in the bar. (Ex. A). The affidavit described the inside of the establishment as a "Restaurant and Sports Bar" where people ate at tables while watching a "large screen TV." (Id.). Batista approximated the capacity of the bar to be 75 people, but noted on the affidavit that he counted 50 in J&J that evening. (Id.). At trial, Batista testified that there were 50–75 people in the bar. (Tr. at 53, 64). Batista also testified that he saw no advertising for the event at J&J. (Tr. at 48) Gelb explained that bars advertise and charge for admission when they show an event legally, in order to recoup their costs in buying the pay-per-view event. (Tr. at 36–37).

The affidavit states that Batista left the establishment at around 11:15 p.m. (Ex. A). Batista explained that he was not wearing a watch on the night in question. (Tr. at 56–57). He testified that he first observed the defendants showing the fight around 10:50 or 10:55 p.m., went into the bar at 11 p.m., and remained in the establishment for close to two minutes before leaving to take a video of the establishment. (Id.). Thus, he may have left the area around 11:15 p.m., but apparently left the bar before 11:15 p.m. (See Tr. at 50, 56–57). The video taken by Batista was submitted by plaintiff and played during the trial. (Tr. at 18–19; Ex. D). It was less than 30 seconds in length, and an image of a boxer's face was barely discernible. (Ex. D). Gelb testified that the video tape did reflect a portion of the McCline/ Byrd fight that occurred between 11 p.m. and 11:15 p.m. on November 13, 2004. (Tr. at 30–31; Ex. D). Batista testified

3

that he took the video from inside his vehicle. (Tr. at 40, 45, 55). He used a hand-held Sony camcorder that was able "to go directly through the glass and [] get that image." (Tr. at 40). Batista explained his method of video recording as follows: "I was in my van and have a Dodge Caravan, which has a tinted side mirror in the back seat, so that was actually done through the side of the tinted side mirror of the Dodge Caravan. . . ." (Tr. at 45). Batista testified that he did so to prevent others from discovering what he was up to. (Tr. at 45). It was impossible to tell, from the video itself, where it was filmed, or whether the location depicted was actually the defendants' establishment. (Ex. D). Batista explained that he is not a "professional photographer" and that he was in a hurry. (Tr. at 56). Batista testified that after he took the video, at around 11:10 or 11:15 p.m., he called Signal Auditing to make sure that he had observed the correct match and to find out whether J&J was a "late legal," i.e., a commercial establishments that purchased the event between the time the authorized list was distributed and the time of the actual event. (Tr. at 14, 50–53).

Batista also testified that Signal's auditors are compensated at the rate of $275 per observation, and are only paid at all if they observe a violation. (Tr. at 54–55). On November 13, 2004, Batista had begun his surveillance around 9 p.m. (Tr. at 43–44). He could not remember exactly how many bars he had visited that night. (Tr. at 43). Batista testified that he had discovered approximately three establishments that were showing the fight illegally and had visited perhaps ten others that were not showing the fight at all, but could not remember how many bars he had checked before stopping at J&J. (Tr. at 43, 61–62).

Defendants called three witnesses on their behalf: Jiminez himself; Ana Jiminez, an employee of J&J; and Boliva Sena, the bar's manager. Jiminez testified that J&J had purchased eight fights in the past from Kingvision.[2] (Tr. at 66). Jiminez testified that the last fight he had purchased for J&J was the "Trinidad" match in Madison Square Garden. (Tr. at 76). However, he testified that he did not purchase the Ruiz/Golota match. (Tr. at 66). Jiminez admitted that he had received a flyer from Kingvision advertising the Ruiz/Golota fight. (Tr. at 73, 78). However, Jiminez maintained that he was at J&J on the night of November 13, 2004, and that the fight was not shown. (Tr. at 70–71). Jiminez also asserted that he has sole responsibility for purchasing pay per view events. (Tr. at 76–77).

---

[2] It is unclear whether Jiminez had purchased these prior fights from Kingvision or from other commercial promoters. Later, defense counsel asked Jiminez whether he had purchased fights from "CableVision," and Jiminez testified that he had. (See Tr. at 77–78).

4

Jiminez testified that J&J has no "floor model" televisions. (Tr. at 68). However, he stated that J&J does have a projector screen that is sometimes used to show pay-per-view events. (Tr. at 68–72). He also testified that J&J has five hanging televisions over the bar, and only one "box" to receive cable television. (Tr. at 68). On cross-examination, Jiminez stated that he also had both DirectTV and cable service at his home in New Jersey. (Tr. at 74–75). On re-direct, Jiminez explained that he had received two DirectTV "boxes" when he purchased the DirectTV system, but only uses one at J&J. (Tr. at 79).

In addition, both parties stipulated that Boliva Sena and Ana Jiminez would give testimony substantively identical to that of Jiminez. (Tr. at 6, 80–81). Boliva Sena stated that he would so testify "because [Jiminez and I] worked together," and Ana Jiminez so stipulated because she "works there also, so she would say the same." (Tr. at 80–81). I accepted these stipulations. (Tr. at 80).

Finally, Edgardo Rodriguez, another auditor, testified in rebuttal that on September 18, 2004, J&J illegally displayed the "De La Hoya/Hopkins" boxing match. (Tr. at 83–84). He testified that the fight was shown on a hanging television over the bar, but could not remember if a projector screen was also used. (Tr. at 84). Jiminez denied that J&J had unlawfully intercepted the De La Hoya match. (Tr. at 76, 87).

## DISCUSSION

### A. Applicable Standards

Anyone who "intercept[s] or receive[s]...any communications service offered over a cable system, unless specifically authorized to do so by a cable operator" violates section 553(a)(1). 47 U.S.C. § 553(a)(1). This provision carries a statutory penalty of up to $10,000, or up to $50,000 if the violation was committed "willfully" and for the purpose of obtaining "commercial advantage" or "private financial gain." 47 U.S.C. § 553(c)(3)(A)(ii). Similarly, any person who is not "entitled" and who receives "any interstate . . . communication by radio and use[s] such communication . . . for his own benefit or for the benefit of another . . ." violates section 605(a). 47 U.S.C. § 605(a). Section 605(a) applies to the unauthorized interception of satellite signals. See Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123, 133 (2d Cir. 1996) ("[S]ection 605 provides protection against the unauthorized reception of...satellite communications.") Violations of section 605(a) carry a statutory penalty of up to $10,000 for an

5

ordinary violation, and up to $100,000 if the violation was committed "willfully and for [the] purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(C)(i)(II)-(ii).[3]

When both section 553 and section 605 apply, a plaintiff may recover damages under only one of the two provisions. See Kingvision Pay-Per-View v. The Body Shop, 00 Civ. 1089, 2002 U.S. Dist. LEXIS 4113, at *10 (S.D.N.Y. March 14, 2002). Section 605 applies even when a satellite signal has been intercepted indirectly via a cable television connection. See Garden City Boxing Club, Inc. v. Guzman, 03 Civ. 8776, 2005 U.S. Dist. LEXIS 7954, at *3–5 (S.D.N.Y. April 26, 2005) ("...when the transmission involves a radio or satellite signal, [section] 605 is appropriately applied, whether the defendant intercepts that signal directly or indirectly"). Here, although plaintiff alleged violations of both sections 553 and 605, it has elected to recover damages only under section 605(a). (See Plaintiff's Brief in Summation, dated May 15, 2006 ("Pltf.'s Summ.") at 5). Thus, to recover, plaintiff must prove by a preponderance of the evidence that the defendants violated section 605. See Garden City Boxing Club, Inc. v. Polanco, 05 Civ. 3411, 2006 WL 305458, at * 3 n.5 (S.D.N.Y. Feb. 7, 2006) (nothing in section 605 suggests an intent to depart from the usual burden of proof in civil litigation).

## B. Application

At trial, plaintiff presented Batista's affidavit, completed several days after he visited J&J, as well as his live testimony in support of that affidavit. (Tr. at 14–15, 40–65). There were several contradictions between that affidavit and Jiminez's testimony. The affidavit states that Batista observed a large "floor model" television, while Jiminez testified that the bar doesn't have a large screen T.V. (although he did admit that the bar occasionally uses a projector screen). (Tr. at 68, 71–72, Ex. A). In addition, the auditor noted only one large screen television in the bar, while Jiminez testified that there are a total of five televisions at J&J. (Ex. A.; Tr. at 68). Rodriguez testified that he had noticed one television set over the bar when he visited J&J on September 13, 2004, but could not recall whether there was a projector in use at the time. (Tr. at 83–84).

---

[3] This penalty may be lowered to $250 if "the violator was not aware and had no reason to believe that his acts constituted a violation of" the statute. 47 U.S.C. § 605(e)(C)(i)(II)-(ii).

The exact time of Batista's visit is also unclear. Batista testified that he was not wearing a watch when he visited the bar. (Tr. at 56–57). The affidavit states that he left J&J at around 11:15 p.m., but he testified that he entered the bar at 11:00 p.m. and remained in the establishment for only two minutes before leaving to take the video from his car. (Ex. A; Tr. at 56–57). Thus, while he may have left the area at 11:15 p.m., he would have exited the bar earlier. (See Tr. at 50, 56–57).

Most troubling is the content of the video itself. According to Gelb, the video reflected a portion of the McCline/Byrd fight that occurred between 11:00 p.m. and 11:15 p.m. on November 13, 2004. (Ex. D.; Tr. at 30–31). However, it is impossible to determine from the content of the video where it was taken. Indeed, nothing that identifies J&J appears on the video. (Ex. D). Batista admitted that, in filming the video, he was focused primarily on capturing an image of the fight, and explained that he was in a hurry. (Tr. at 55–56). Batista also testified that he began looking for potential violations around 9 p.m. on November 13th, and estimated that he visited over ten establishments, approximately three of which he discovered showing the fight without permission. (Tr. at 43–44). From the testimony and evidence it is impossible to tell if Batista, either purposefully or mistakenly, took this video at one of the other establishments he visited that night. On balance, Batista's testimony created credibility issues for me while Jiminez and his witnesses appeared sincere and credible.

Jiminez testified unequivocally that he was in J&J on the night of November 13th and that the fight was not shown. (Tr. at 67). He also testified that he exercises sole discretion as to whether or not to purchase pay-per-view events. (Tr. at 77). Jiminez's testimony was corroborated by the stipulated testimony of two other witnesses. Both of them agreed with Jiminez that the fight was not shown at the defendant's establishment. (Tr. at 6, 80–81). "[A] stipulation as to the testimony a witness would give if called . . . may constitute evidence of the facts covered, [although it] is not an admission of the truth of such testimony . . . ." U.S. v. Spann, 515 F.2d 579, 583 (10th Cir. 1975) (citing 83 C.J.S. Stipulations § 23f (1953)); Stokes v. New York State Dept. of Correctional Services, 569 F. Supp. 918, 919-20 (S.D.N.Y. 1982) (permitting stipulated testimony when that testimony would be substantially similar to that of other witnesses testifying). Cf. McFowler v. Jaimet, 349 F.3d 436, 450-51 (7th Cir. 2003) (stipulation as to content of testimony does not obligate trier of fact to accept such "would-be testimony").

7

Needless to say, defendants' witnesses are far from disinterested. Jiminez himself is a named defendant, and the other two witnesses were both his employees. In addition, Rodriquez testified that J&J had displayed another fight without permission on a separate occasion. (Tr. at 83– 84). However, Batista's testimony was not free from doubt either. Batista testified that he is only compensated by Signal auditing when he discovers a pirating establishment. (Tr. at 55). Thus, he had a financial interest in finding a bar that was showing the fight illegally.

In sum, having heard all of the evidence presented, I find that plaintiff has not sustained its burden of proving by a preponderance of the evidence that defendants displayed a portion of the Ruiz/Golota fight on November 13, 2004. Plaintiff's auditor had visited multiple establishments on the night in question, and failed to accurately record key information about J&J, such as the number of televisions and the type of screen upon which the fight was displayed. The plaintiff's videotape is entirely unhelpful, as it does not corroborate Batista's testimony that the video was taken at J&J. Defendants' witnesses did not visit multiple establishments on November 13, 2004, and therefore are less likely to be mistaken in their recollection. Therefore, I credit the testimony of Jiminez and the other defense witnesses rather than that of Batista. While Batista may well have discovered a bar illegally showing the Ruiz/Golota match on November 13, 2004, plaintiff has not sustained its burden of proving that the violation occurred at J&J.

## CONCLUSION

For the reasons set forth above, I find that plaintiff has failed to sustain its burden of proving that defendants pirated the Ruiz/Golota event on November 13, 2004. The Clerk of the Court is directed to enter judgment for the defendants, and to remove this case from my docket.

SO ORDERED.

August \_\_, 2006
New York, New York

U.S.D.J.

8